IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIO ALLEN | ) | |
| | ) | |
| Plaintiff, | ) | CASE No.: 09 C 2133 |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL J. ASTRUE | ) | Magistrate Judge |
| Commissioner of | ) | Arlander Keys |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mario Allen, moves this Court for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), who denied his claim for Disability Insurance Benefits ("DIB") (42 U.S.C. § 401 *et seq.* (West 2007)). Mr. Allen seeks retroactive and prospective benefits, as well as attorney's fees. In the alternative, Mr. Allen seeks an order reversing and remanding the Commissioner's decision. The Commissioner has filed a cross motion for summary judgment, seeking an order affirming his final determination. For the reasons set forth below, Mr. Allen's motion for summary judgment is granted in part and denied in part, the Commissioner's motion for summary judgment is denied, and the case is remanded to the Commissioner for further proceedings.

<u>PROCEDURAL HISTORY</u>

On August 22, 2006, Mr. Allen filed an application for Disability Insurance Benefits ("DIB"), alleging a disability beginning December 1, 2005. The claim was denied on November 13, 2006. R at 70. Mr. Allen requested reconsideration on January 16, 2007, R at 76, and on April 16, 2007, the Regional Commissioner affirmed the denial. R at 86. On Jun 15, 2007, Mr. Allen requested a hearing before an Administrative Law Judge ("ALJ"). R at 90.

A hearing was held on January 16, 2008, before ALJ Joseph P. Donovan, Sr. in Orland Park, Illinois. The ALJ issued an unfavorable decision on September 3, 2008, finding that Mr. Allen had not been under a disability within the meaning of the Social Security Act. Mr. Allen filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on October 22, 2008. On March 9, 2009, the Appeals Council denied the request for review, making the ALJ's September 3, 2008 decision the final administrative determination of the Commissioner.

On April 30, 2009, Mr. Allen filed a complaint in the United States District Court for the Northern District of Illinois, seeking review of the Commissioner's determination. The parties consented to proceed before a United States Magistrate Judge, and, on July 6, 2009, the case was reassigned to this Court.

FACTUAL HISTORY

A. Hearing of January 16, 2008

At the hearing on January 16, 2008, the ALJ heard from Mr. Allen, a medical expert, and a vocational expert.

1. Mr. Allen's Testimony

Mr. Allen was 40 years old at the time of the hearing.  R at 15.  He testified that he had graduated from high school and attended two years of college, but had not received a degree.  R at 14-15.  Mr. Allen testified that he had not done any work for pay since December 1, 2005, and that he was supported by his wife.  R at 15.

When questioned about his physical capabilities, Mr. Allen testified that he could sit or stand for about 30 minutes at a time.  R at 16.  He also testified that he could walk about a block before getting short of breath, did not need a cane or other assistive device, and could not crouch down or crawl without getting dizzy.  R at 16.  Mr. Allen testified that he could probably lift 15 pounds, push 15 pounds in a cart, and carry about five pounds.  R at 17.  He also testified that he could make a fist with either hand, but stated that his hands were swollen.  R at 18.  Mr. Allen testified that he experienced shortness of breath when he bent over, walked too far, or exerted himself.  R at 19.

Mr. Allen testified that, although his speech was usually clear, his medicine sometimes caused him to slur his speech. R at 20. He testified that sometimes he had problems with conversations and attention. R at 21. Mr. Allen also testified that he was bothered by direct sunlight and that he'd been told to avoid the sunlight. R at 22.

Mr. Allen testified that he had previously worked as a doorman, insurance salesman, and car salesman. R at 37-42. In his job as a doorman, Mr. Allen testified that he did not have to lift anything more than 10 pounds, and worked while sitting for five or six hours of an eight-hour work day. R at 39-40. In his job as an insurance salesman, Mr. Allen testified that he spent most of the day driving, and spent only 30 or 40 minutes of his workday on his feet. R at 40-41. In his job as a car salesman, Mr. Allen testified that he was on his feet the majority of the workday, and there was no lifting involved in his job. R at 42.

### 2. Testimony of Dr. Ashok Jihewar, Medical Expert

Dr. Ashok Jihewar, a medical expert ("ME"), also testified at Mr. Allen's hearing. R at 24-37. The ME testified that he had reviewed Mr. Allen's medical file, but did not find any documentation of the presence of Lupus. R at 25. The ME testified that, to be diagnosed with Lupus, one needs to have antinuclear antibodies positive, as well as DNA antibody positive and a low serum compliment. R at 25. The ME testified that Mr.

Allen's treating physician wrote in his September 30, 2006 examination that Mr. Allen had Lupus arthritis. R at 25. The ME also testified that Mr. Allen's lab test of January 19, 2007 showed DNA antibody negative and normal compliment. R at 25-16. The ME testified that he did not find any evaluation for antinuclear antibody. R at 26. The ME also testified that Mr. Allen's treating physician had noted on February 14, 2006 and September 30, 2006, that systemic Lupus erythemautosus was not active. R. at 26. The ME testified that Mr. Allen's treating physician's office visit notes and lab data were not consistent with the treating physician's diagnosis of Lupus arthritis. R. at 26.

The ME also testified that the office visit notes and lab data were not consistent with the presence of a Lupus interstitial lung disease. R. at 26. The ME testified that he did not find any chest x-ray or pulmonary function test. R. at 26. The ME testified that Mr. Allen's lab tests from January 19, 2006, showed a normal hematocrit of 41.2 and a low white cell count of 2.9. R. at 26. The ME testified that he could not explain these results because Lupus usually resulted in anemia and a high white cell count. R. at 26.

The ME testified that it was not typical to see Raynaud's phenomenon because of underlying systemic Lupus. (R. at 27). The ME testified that there had not been a consultative

examination, and that if one were to be ordered, a rheumatology exam would be most helpful, and the ME would request antinuclear antibody, and dsDNA laboratory tests. R. at 27-28. The ME testified that he had no significant abnormal clinical findings to establish a residual functional capacity of less than sedentary or equaling the listing of 14.02B. R. at 30.

Under examination by Mr. Allen's attorney, the ME's attention was directed to evidence in the medical record indicating that on January 19, 2006, the claimant's ANA test result was positive, titer below 80, with a sedimentation rate of nine. R at 31. The ME testified that the titer results were borderline, and the sedimentation rate showed that, if Mr. Allen had Lupus, the Lupus was not active at that time. R. at 31-32. The ME testified that it was possible to diagnose Lupus without a dsDNA result. R. at 32. The ME testified that the SSA was not there to diagnose Mr. Allen's condition, but only to determine the severity of his symptoms. R. at 32.

The ME testified that a person could have symptoms such as muscle pains and joint pains without objective evidence of those symptoms, but that he would expect that person's sedimentation rate to be higher than 40. R. at 33. The ME testified that, although the record contained indications of Raynaud's, joint pain, unusual mentation, mild arthralgias, and interstitial lung disease, these were all non-specific and not particular to Lupus.

R. at 35-36.  The ME also testified that he could not render an opinion on severity based on the record.  R. at 36-37.

### 3.   Testimony of Thomas Grzesik, Vocational Expert

In addition to Mr. Allen and the ME, the ALJ heard from Thomas Grzesik, a vocational expert ("VE").  (R. at 42-51).  He testified that Mr. Allen performed unskilled work at the sedentary exertional level while employed as a doorman.  (R. at 42).  The VE testified that Mr. Allen performed semi-skilled work at the medium exertional level while employed as a stock clerk. R. at 42.  The VE testified that Mr. Allen performed skilled work at the light exertional level while employed as an insurance salesperson.  R. at 43.  The VE testified that Mr. Allen performed skilled work at the light exertional level while employed as an automobile salesperson.  R. at 43.  The VE testified that the skills involved in Mr. Allen's previous jobs were industry specific and not transferrable.  R. at 43.

The ALJ described to the VE a hypothetical person who matched Mr. Allen in age, education, and background and had Mr. Allen's physical and mental attributes.  R. at 44.  The VE testified that such a person would be able to perform Mr. Allen's past relevant work as a doorman, insurance salesperson, and automobile salesperson.   R. at 44.  Additionally, the VE testified that such a person being off task about two percent of the time in the workday would have no significant effect on the

person's ability to perform these jobs. R. at 45. The VE also testified that a mental experience of stress, anxiety, memory deficiency, and distraction or preoccupation leading to the person being off task an additional one percent of the time would have no significant effect on the person's ability to perform these jobs. R. at 45.

Under examination by Mr. Allen's attorney, the VE testified that, if a person could not work in cold temperatures or be exposed to cold temperatures beyond traveling to work, that person would not be able to perform any of Mr. Allen's prior jobs. R. at 46. Additionally, the VE testified that if a person were unable to work at unscheduled times for an hour on two days out of the week due to nosebleeds, headaches, pain, or some other symptom, then that person would not be able to sustain work activity because that would exceed 10 percent of a workday. R. at 47. The VE also testified that, if a person needed to walk away from their workstation at unscheduled times, that person would not be able to perform unskilled work or Mr. Allen's past jobs. R. at 47.

The VE then considered a hypothetical person who matched Mr. Allen in age, education, and background and who had Mr. Allen's physical and mental attributes, but who was off task up to two percent of the workday, due to pain and medication and one percent due to mental experience, and who had to avoid

concentrated exposure to cold. R. at 50. The VE testified that, while this hypothetical individual would not be able to perform Mr. Allen's past relevant work, there were jobs that existed in the region that would be available to such a person. R. at 50-51. The VE testified that such a person could perform the jobs of office helper (approximately 14,000 jobs in the region), cashier (approximately 26,000 jobs in the region), and sales attendant (approximately 18,000 jobs in the region). R. at 51.

After the hearing on January 16, 2008, the ALJ held the record open for one week so that Mr. Allen could submit medical records to fill in the gaps indicated by the ME. R. at 50.

B. Medical Evidence

In addition to the testimony of Mr. Allen, the ME, and the VE, the ALJ had before him an abundance of medical records.

1. Medical Records From Prior to the Alleged Onset Date

Mr. Allen's attorney informed the ALJ that Mr. Allen had filed a prior application alleging a date in 2004 as the alleged onset. R. at 334. That claim was denied by the Commissioner, and that decision was appealed by Mr. Allen. R. at 334. Mr. Allen's attorney submitted medical records from prior to the currently alleged onset date[1]. R. at 334.

_____

[1] On June 11, 2010, pursuant to a request by the Court, the parties submitted to the Court a joint stipulation regarding Plaintiff's prior application. That stipulation reveals that the prior application was filed on February 25, 2004, and was

On November 29, 2002, an Oak Forest Hospital Ambulatory Health Center referral indicates that Mr. Allen had interstitial damage in both lungs. R. at 339. As the result of an April 28, 2004 examination, Dr. Stanley Rabinowitz wrote a letter to the State of Illinois Disability Determination Services stating that Mr. Allen had full range of motion in his knees and elbows and mild puffiness of the joints of the hands. R. at 353. Dr. Rabinowitz also noted a history of probable Raynaud's phenomena along with chronic fatigue. R. at 352. Dr. Rabinowitz stated that his impression was of a history of systemic lupus erythematosus with constitutional symptoms and arthropathy. R. at 354.

   2.  Disability Reports

Mr. Allen submitted several disability reports to support his history of physical impairments. In these reports, Mr. Allen stated that he was constantly fatigued, R. at 146, 165, 177, 181, 186, had blurred vision, R. at 167, 169, 177, 182, 187, and had migraine headaches, R. at 175, 181. Additionally, Mr. Allen reported that he had swollen joints, R. at 146, had cramped hands and feet, R. at 177, had constant nosebleeds, R. at 181, and had to use the bathroom frequently. R. at 146, 167, 177, 182, 187.

---

denied by the Commissioner on November 30, 2005. Plaintiff petitioned for judicial review, and on November 13, 2008, that case was remanded to the Commissioner by Magistrate Judge Michael T. Mason.

Mr. Allen also answered questions regarding his daily living. R at 164-167. Mr. Allen indicated that he did few household chores other than watching his children, and did not leave his home often. R. at 167.

### 3.   Medical Records After the Alleged Onset Date

Laboratory test results from January 19, 2006, submitted by Mr. Allen, indicated a positive ANA, a negative anti-dsDNA, an ANA titer of 80 with a C3 complement of 113 and C4 compliment under 10. R. at 272.

On February 14, 2006, Mr. Allen presented to Dr. Charles Geringer as a new patient, self-referred. R. at 315. Dr. Geringer is a rheumatologist. R. at 207. Mr. Allen reported to Dr. Geringer that in January of 2003, Cook County Hospital diagnosed him with lupus without kidney involvement. R. at 315. Dr. Geringer noted that Mr. Allen's joints showed no active synovitis and good range of motion. R. at 315. Dr. Geringer recorded his impression as "Systemic lupus by history. Currently on steroids with somewhat vague symptomatolgy, though nothing that appears to represent active disease." R. at 315.

On April 16, 2006, Mr. Allen presented to St. James Hospital, complaining of nausea, vomiting, and diarrhea. R. at 253. Mr. Allen's past medical history indicated that he had been diagnosed with Lupus 2 years prior. R. at 255.

On June 30, 2006, Mr. Allen visited Dr. Geringer for a

follow-up visit. R. at 313. Dr. Geringer indicated that Mr. Allen had some intermittent joint pain and mild morning stiffness. R. at 313. Dr. Geringer indicated his impression was "History of lupus currently with some mild arthralgias." R. at 313.

On September 30, 2006, Mr. Allen presented to Dr. Geringer for a follow-up visit. R. at 317. Mr. Allen complained of medication problems and asked about herbal treatments. R. at 317. Dr. Geringer indicated that Mr. Allen had a weight of 166 pounds, and indicated no problems with any joints, grip strength, or significant limitations in doing repetitive reaching, handling, or fingering. R. at 279, 317. Dr. Geringer indicated that Mr. Allen needed to include periods of walking around during an 8 hour working day. R. at 280. Dr. Geringer noted that Mr. Allen had no current pulmonary problems, but his mentation was "somewhat unusual. He perseverates with ideas about medication and his circumstances. At times he does not seem very logical." R. at 317. Based on the "negative results to date on his laboratories," Dr. Geringer indicated his plan to decrease Mr. Allen's medication. R. at 317. Dr. Geringer recorded his impression as "systemic lupus with history of Raynaud disease and arthropathy without much activity at present superimposed on a history of interstitial lung disease." R. at 317.

On November 1, 2006, Dr. Virgilio Pilapil prepared a physical residual functional capacity assessment for Mr. Allen. (R. at 285). Mr. Allen's exertional limitations were limited to occasionally lifting and/or carrying 20 pound, frequently lifting and/or carrying 10 pounds, and standing and/or walking for about 6 hours in an 8-hour work day. R. at 286. Mr. Allen's postural limitations were limited to occasionally climbing ramps and stairs, and never climbing ladders, ropes, and scaffolds due to fatigue. R. at 287. No manipulative, visual, communicative, or environmental limitations were established. R. at 288-89.

On January 19, 2007, Mr. Allen again presented to Dr. Geringer for a follow-up visit. R. at 302. Mr. Allen reported that he was having pain in his joints, poor endurance, occasional nose bleeds, and some chest pain. R. at 302. Dr. Geringer noted that, "overall he continues to do about the same." R. at 302. Dr. Geringer recorded his impression as, "Systemic lupus. Patient continues to function rather poorly but without any evidence actively of inflammatory disease thus far." R. at 302. Samples were submitted for laboratory testing, R. at 325-332, and a dsDNA test returned normal results of < 1:10. R. at 328.

On May 11, 2007, Mr. Allen presented to Dr. Geringer for a follow-up visit. R. at 386. Mr. Allen complained predominately of central nervous system symptoms, including short term forgetfulness, losing things, trouble concentrating, increasing

stress, and poor sleep. R. at 386. Mr. Allen's joints showed some swelling in the MCPs, PIPs, and knees. R. at 386. Dr. Geringer indicated that Mr. Allen's joints were not really bothering him even though there was some mild synovitis. R. at 386. Additionally, Dr. Geringer asked Mr. Allen to see a neurologist. R. at 386.

On May 29, 2007, Dr. Geringer wrote to Mr. Marcus Sherrod at the Bureau of Disability Determination Services, indicating that Mr. Allen had systemic lupus and arthritis that was active in his hands and knees. R. at 309. Dr. Geringer indicated that Mr. Allen had not responded well to medication and has persistent joint inflammation, which caused significant fatigue and inability to maintain a normal 8-hour work day. R. at 309. Dr. Geringer also indicated that Mr. Allen had poor concentration and poor memory. R. at 309.

On May 31, 2007, Dr. Young Il Ro performed a neurologic examination on Mr. Allen. R. at 383. Mr. Allen complained of twitching of the hands and feet, blurred vision, short-term memory disturbance, headache, muscle fatigue and weakness, numbness, tingling in the hands and feet, and frequent nosebleeds. R. at 383. Dr. Ro ruled out central nervous system lupus, peripheral neuropathy or myopathy, and seizure disorder. R. at 383.

On September 7, 2007, Mr. Allen presented to Dr. Geringer for a follow-up visit. R. at 375. Mr. Allen's only complaint remained that of fatigue. Dr. Geringer noted that Mr. Allen's wrists and knees showed mild synovitis, but good range of motion and strength. Dr. Geringer recorded his impression as "[s]ystemic lupus with mild persisting arthritis and some moderate fatigue." *Id.*

Following the hearing, on February 6, 2008, Dr. Geringer completed a Residual Functional Capacity Questionnaire regarding Mr. Allen. R. at 200. In responding to the questionnaire, Dr. Geringer indicated that he had seen Mr. Allen six or seven times since February, 2006. *Id.* Dr. Geringer indicated that a discoid rash, swelling in the eMCP's PIP's right elbow, and both ankles seen in January 2008, and significant limitations of motion for the right elbow were objective signs of Mr. Allen's impairment. R. at 200-201. Additionally, Dr. Geringer indicated that leucopenia (white blood count below 4,000/mm) in February 2002 and June 2006, a positive test for ANA in April, 2004, severe fatigue, and Raynaud's phenomenon were other objective signs of Mr. Allen's impairment. R. at 202. Dr. Geringer indicated that Mr. Allen's symptoms were frequently severe enough to interfere with attention and concentration, but that Mr. Allen was capable of low stress jobs. R. at 203. Dr. Geringer indicated that Mr. Allen should avoid even moderate exposure to extreme cold. R. at

204. Dr. Geringer further indicated that Mr. Allen met the requirements of Listing 14.02B for Systemic Lupus Erythematosus because of hematologic involvement and moderately severe joint involvement. R. at 206.

C. Work History Report

Mr. Allen also submitted to the ALJ a work history report. In the report, Mr. Allen indicated that he had performed a variety of different jobs in the last 15 years. R. at 155.

Among the jobs listed, Mr. Allen indicated he had worked as a doorman from August 1995 until April 2000. As a doorman, Mr. Allen stated that he was required to do some light lifting of luggage, typically less than 10 pounds.

Mr. Allen also worked as a stocker in a number of different retail stores. R. at 155. As a stocker, Mr. Allen stated that he frequently lifted 10 pounds, and had to lift and place inventory on a pallet. R. at 159. Mr. Allen worked as an insurance salesman from April until September of 2001. As a salesman, Mr. Allen stated that he did door-to-door collecting of policies for 200 clients. R. at 160. Mr. Allen also listed a number of sales positions that he had performed, including jewelry sales and car sales. R. at 155.

The ALJ's Decision

In his decision of September 3, 2008, the ALJ concluded that Mr. Allen was not disabled under sections 216(I) and 223(d) of

the Social Security Act.  R. at 69.  In making this
determination, the ALJ applied the five step sequential analysis
outlined in the Social Security regulations.

At step one, the ALJ determined that Mr. Allen had not
engaged in any substantial gainful activity since the alleged
onset date of December 1, 2005.  R. at 63.

At step two, the ALJ found that Mr. Allen had the following
severe impairments: connective tissue disorder (systemic lupus
erythematosus), Reynaud's Syndrome and arthralgias.  In support
of this finding, the ALJ stated that the medical records
establish that Mr. Allen was diagnosed with systemic lupus
erythematosus in January, 2004, and has a history of Raynaud's
Syndrome.

At step three, the ALJ determined that Mr. Allen did not
have an impairment or combination of impairments that met or
medically equaled one of the listed impairments in 20 C.F.R. Part
404, Subpart P, Appendix 1.  R at 65.  The ALJ considered
sections 14.02, Systemic Lupus Erythematosus, and 14.09,
Inflammatory Arthritis, in arriving at this conclusion. In
support of this finding, the ALJ reviewed the reports and
treatment notes from Dr. Geringer from June 30, 2006 through
September 7, 2007.  R. at 63.  In these treatment notes, the ALJ
pointed out Dr. Geringer's notes of joints having good range of
motion, nothing appearing to represent active disease, and no

evidence of inflammatory disease thus far.  R. at 63-4.  The ALJ also noted the contradiction between Dr. Geringer's treatment records and his correspondence with the Bureau of Disability Determination Services on May 29, 2007, in which Dr. Geringer stated that the claimant had persistent joint inflammation that causes fatigue and would preclude the claimant from working on a full-time basis.  R. at 64.  Additionally, the ALJ noted that Dr. Geringer had stated that the claimant has poor concentration and memory, but Dr. Geringer had not provided elaboration regarding the cause of these limitations, nor had he referenced contemporaneous treatment records to corroborate his statements.

The ALJ also reviewed other medical opinions in the Record. R. at 64-65.  The ALJ noted that Dr. Pilapil's November 1, 2006 report concluded that the claimant could occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand, and walk about six hours in an average, eight-hour work day, with non-exertional limitations on climbing ramps, stairs, ladders, ropes, and scaffolds.  R. at 64.  The ALJ also noted Dr. Pilapil's finding that Mr. Allen had normal range of motion in all joints and no problems with fine or gross motor activities.  R. at 64. The ALJ next noted Dr. Rabinowitz's April 28, 2004 report, in which Dr. Rabinowitz found no abnormalities other than mild puffiness of the joints of the hands, without frank synovitis or intrinsic muscle atrophy.  R at 64-65.

The ALJ concluded that the evidence was insufficient to satisfy the criteria of either section 14.02 or 14.09, because Mr. Allen's allegations of joint pain were not corroborated with clinical signs of persistent swelling, loss of range of motion, diminished strength, or loss of function. R. at 65. Under section 14.09, the ALJ concluded that the record did not contain medical documentation of any of the possible requirements to meet the listing. R. at 65-66. The ALJ noted that these findings were consistent with the testimony of the ME. R. at 66.

The ALJ next found that Mr. Allen had the RFC to perform a full range of work at all exertional levels, but with non-exertional limitations relating to climbing ramps, stairs, ropes, ladders, and scaffolds. R. at 66. The ALJ found that Mr. Allen's perception of pain, medications, stress, and anxiety would result in his being off-task for approximately 3% of the total work day, and Mr. Allen would need to avoid concentrated exposure to cold temperatures due to his Raynaud's Syndrome. R. at 66. The ALJ noted Dr. Geringer's statement that Mr. Allen's symptoms would interfere with his attention and concentration, but Mr. Allen remained capable of working in low stress jobs as long as he was not exposed to cold due to his Raynaud's Syndrome. R. at 65.

The ALJ also found that Mr. Allen's statements concerning his impairments and their impact on his abilities were not

supported by the medical evidence. R. at 66. The ALJ stated that Mr. Allen's activities of daily living had not been profoundly compromised by his impairment. R. at 67. The ALJ noted that this finding was not to say that Mr. Allen was pain free or that he had no limitations in performing some tasks, but that Mr. Allen's statements as to the severity of those symptoms were inconsistent with the objective evidence. For these reasons, the ALJ found that Mr. Allen's testimony was not fully credible.

The ALJ then found that Dr. Geringer's opinion was not persuasive on the issue of disability or Mr. Allen's RFC. The ALJ explained that Dr. Geringer's opinion was inconsistent with his own treatment notes and the remainder of the medical record. R at 67. The ALJ noted that all of Mr. Allen's physical and serology testing were within normal limits, and the testing showed no joint swelling, no signs of synovitis, no loss of range of motion, nor decreased strength. The ALJ also noted that Dr. Geringer's own notes labeled Mr. Allen's symptoms and complaints as "mild" and "vague." The ALJ stated that Mr. Allen's condition was well-controlled with medication and that no further medical intervention had been necessary since his diagnosis in 2004. Finally, the ALJ found that his RFC determination was consistent with the ME's testimony. R. at 67.

At step four, the ALJ determined that Mr. Allen was unable to perform any past relevant work. R. at 67. The ALJ agreed with the VE's testimony that Mr. Allen would be incapable of performing any of his past relevant work, either as actually or generally performed. The ALJ also found that the transferability of job skills was not material to the determination of disability, because the VE testified that there were no skills acquired in Mr. Allen's past relevant work that would be transferable to other occupations. R at 68.

At step five, the ALJ determined that jobs in significant numbers existed in the national economy that Mr. Allen could perform. R. at 68. The ALJ acknowledged that Mr. Allen's ability to perform work at all exertional levels had been compromised by his nonexertional limitations. The ALJ considered the VE's testimony that an individual with Mr. Allen's age, education, work experience, and RFC could perform the requirements of representative occupations at the light and unskilled level such as office helper (D.O.T. code 239.567-101 with 14,000 such jobs in the regional economy), cashier (D.O.T. code 211.462-010 with 26,000 such jobs in the regional economy), and sales attendant (D.O.T. code 299.677-010 with 18,000 such jobs in the regional economy). The ALJ determined that Mr. Allen was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. R at 69.

Accordingly, the ALJ concluded that Mr. Allen had not been under a disability, as defined in the Social Security Act, from December 1, 2005 through the date of his decision. R at 69.

## Social Security Regulations

When an individual claims a need for DIB, he must prove the existence of a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the Social Security Regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's residual functional capacity ("RFC"); and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290

F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

Mr. Allen raises three issues before this Court.[2]  First,
Mr. Allen argues that the ALJ erred by giving greater weight to
the ME than to Mr. Allen's treating physician regarding Mr.
Allen's RFC.  Second, Mr. Allen argues that the ALJ erred by
failing to give specific reasons for finding incredible Mr.
Allen's testimony with respect to his RFC.  Finally, Mr. Allen
argues that the ALJ's assessment that he had the RFC to perform
the full range of work at all exertional levels with only minimal
limitations was not supported by the record.  The ALJ's findings
regarding the credibility of Mr. Allen's treating physician and
Mr. Allen are affirmed.  However, The ALJ's finding that Mr.
Allen has the RFC to perform work at all exertional levels is
problematic.

A.   Credibility of Treating Physician

Mr. Allen argues that the ALJ erred by not giving the
opinions of Dr. Geringer, Mr. Allen's treating physician of two
years, greater weight than the opinion of the ME, a non-examining
physician.  The opinion of a treating physician will generally be
given greater weight than the opinion of a non-examining

---

[2] Mr. Allen also raised a fourth issue, whether the ALJ
adequately discussed evidence of Mr. Allen's Lupus in conjunction
with listing 14.02.  However, Mr. Allen conceded in his reply
brief that the ALJ did not err with respect to this issue.
Plaintiff's Reply Brief in Support of Motion for Summary Judgment
at 5.

physician. 20 C.F.R. § 404.1527(d)(1). A treating physician's medical opinion will be given controlling weight if it is well-supported by medically accepted clinical and laboratory diagnostic techniques, and if the opinion is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2).

In evaluating a treating physician's opinion, the ALJ should consider factors including the length of the treatment and frequency of evaluation, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating physician. *Id.* Even if the ALJ discounts the treating physician's opinion, the consideration of these factors does not need to be explicit; the ALJ only needs to "minimally articulate" his reasons for discounting the treating physician's opinion, a standard that the Seventh Circuit has described as "very deferential" and "lax". *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

The Record supports the ALJ's well-articulated analysis and determination that Dr. Geringer's opinion was not supported by the medical evidence. The ALJ found Dr. Geringer's opinion as to Mr. Allen's RFC not persuasive "because it is inconsistent with his own treatment notes, as well as the remainder of the medical record." R. at 67.

A review of the Record confirms that Dr. Geringer's notes do not support his opinion. Although Dr. Geringer's notes show a consistent diagnosis of systemic lupus erythematosus, the notes also indicate that the symptoms were mostly mild and that the disease was mostly inactive. On February 14, 2006, Dr. Geringer indicated that Mr. Allen had no active synovitis and a good range of motion, that his symptoms were "vague," and nothing appeared to represent active disease. R. at 315. On June 30, 2006, Dr. Geringer noted only intermittent joint pain and mild stiffness. R. at 313. On September 30, 2006, Dr. Geringer indicated that there was not much disease activity at present, and noted that Mr. Allen had no problems with his joints or grip strength. R. at 279, 317. On January 19, 2007, Dr. Geringer noted that there was no evidence of active inflammatory disease thus far. R. at 302. On May 11, 2007, Dr. Geringer noted only mild synovitis, which was not bothering Mr. Allen. R. at 386. On September 7, 2007, Dr. Geringer again noted only mild synovitis, but noted good range of motion and strength. R. at 375.

The remaining medical evidence also contradicts Dr. Geringer's opinion. The April 28, 2004 consultative evaluation performed by Dr. Rabinowitz, although conducted prior to the alleged onset date, indicated that Mr. Allen had full range of motion in his knees and elbows and only mild puffiness of the joints of the hands. R. at 353. The November 1, 2006 RFC

assessment performed by Dr. Pilapil, as referenced by the ALJ, R. at 64, indicated that Mr. Allen had normal range of motion in his joints and no manipulative limitations were established. R. at 288-289. At a May 31, 2007 neurologic examination by Dr. Ro, Mr. Allen complained of symptoms including twitching of the hands and feet, short-term memory disturbance, headache, and muscle fatigue and weakness, Dr. Ro noted, that based on his examination, Mr. Allen's muscle strength was fairly normal. R. at 383. The evidence from the ALJ's finding was also consistent with the testimony of the ME following his review of the medical record. R. at 30.

Once the ALJ found that Dr. Geringer's opinion was not controlling, he was required to determine how much weight to give the opinion under the factors specified in 20 C.F.R. §1527(d)(2). The ALJ laid out the specific reasons within Dr. Geringer's notes that led him to determine that Dr. Geringer's opinion was not entitled to much weight. R. at 67. The ALJ's references to not only Dr. Geringer's notes, but also the medical evidence of Dr. Pilapil, Dr. Rabinowitz, and the ME were enough to minimally articulate his reasons. See Elder, 529 F.3d at 415 ("If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons – a very deferential standard that we have, in fact, deemed lax" internal quotations omitted).

The ALJ focused on two of the factors, the supportability of the opinion and the consistency of the opinion with the record as a whole, and he found that Dr. Geringer's opinion was not supported by his own treatment notes, and it was not consistent with the record as a whole. R. at 67. The ALJ's findings as to supportability and consistency are sufficient to "minimally articulate" his reasons. Accordingly, the ALJ did not err in giving the ME's opinion greater weight because it was consistent with the medical evidence. R. at 66-67.

B.  Credibility of Mr. Allen

Mr. Allen next argues that the ALJ erred by failing to explain his reasons for finding that Mr. Allen's testimony was not fully credible. The ALJ's credibility determination is reviewed with deference. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). An ALJ's credibility determination must contain specific reasons for his finding. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). When assessing the claimant's credibility, the ALJ does not need to rely on a citation of the claimant's subjective complaints where it is not supported by the objective evidence. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Instead, the ALJ should consider factors such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medications taken, and functional limitations to

determine credibility. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

In his opinion, the ALJ found that Mr. Allen's testimony was not fully credible because his statements regarding his impairments and their impact on his ability to work were "inconsistent with the objective evidence." R. at 67. The ALJ did find that Mr. Allen's impairments could reasonably be expected to produce the alleged symptoms, but found that Mr. Allen's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the totality of the medical record." R. at 67. The ALJ then noted that the medical evidence indicated only mild symptoms and complaints, and that Mr. Allen's condition appeared to be well-controlled with medication.

As to Mr. Allen's daily activities, the ALJ stated that, "[h]is activities of daily living have not been profoundly compromised by his impairment, as evidenced by the ability to carry out activities of daily living." R. at 67. The ALJ found that Mr. Allen's statements were inconsistent with the objective evidence, which indicated that Mr. Allen's impairments did not rise to the level of severity "as to preclude the claimant from performing any work on a regular and continuing basis." R. at 67.

Mr. Allen also argues that the ALJ failed to discuss with specificity which part of Mr. Allen's testimony regarding his daily activities was not credible. Plaintiff's Reply Brief in Support of Motion for Summary Judgment at 6. The Commissioner argues that the ALJ considered the relevant factors, but found Mr. Allen's complaints "far too severe to comport with the medical evidence."

In support of his finding, the ALJ was required to give specific reasons for his finding. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The ALJ noted that Mr. Allen's complaints were inconsistent with the objective medical evidence presented in the record. R. at 67). Specifically, the ALJ noted that the medical evidence indicated that Mr. Allen had only mild symptoms and complaints, and that these appeared to be well-controlled with medication. Conversely, Mr. Allen testified that his symptoms rendered him unable to work. Although the ALJ did not point to specific inconsistencies in Mr. Allen's statements regarding his activities of daily living, he did note Mr. Allen's ability to carry out activities of daily living in deciding that Mr. Allen's testimony was not fully credible, particularly discounting the testimony that was inconsistent with the totality of the medical record. R at 67.

Where the complaints were not supported by the objective medical evidence, the ALJ was not required to rely upon Mr.

Allen's subjective assessment of his pain. *See Rice*, 384 F.3d at 371. In *Rice*, the claimant had complained to her treating physician that she was unable to lift certain items and that sitting and walking for more than one-half hour worsened her pain. *Id.* at 376. However, the physician's clinical findings were negative. *Id.* at 370. The Seventh Circuit held that the ALJ in *Rice* should rely on medical opinions based on objective observations, and not merely a citation of the claimant's subjective complaints. *Id.* at 371.

Similarly, this Court finds that the ALJ acted properly in viewing Mr. Allen's subjective statements in light of the objective medical evidence. R. at 67. The ALJ expressly stated that the objective evidence "does not demonstrate the existence of pain and limitations of such severity as to preclude the claimant from performing any work on a regular and continuing basis," R. at 67, and that Mr. Allen's testimony to the contrary was not fully credible. Nothing more is required of the ALJ in this instance. Accordingly, the Court finds that the ALJ did not err in failing to provide more explicit reasons for discounting Mr. Allen's testimony.

C. <u>Residual Functional Capacity and Range of Work</u>

Finally, Mr. Allen argues that the ALJ's finding that Mr. Allen had the RFC to perform the full range of work, at all exertional levels, with only minimal limitations, is not

supported by the record. Because the ALJ failed to build a logical bridge from the evidence to his conclusion that Mr. Allen could perform all exertional levels of work, remand on this issue is warranted. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

The ALJ found that Mr. Allen had the RFC to "perform a full range of work at all exertional levels" but "should limit climbing ramps and stairs to an occasional basis and avoid climbing ropes, ladders or scaffolds." R. at 66. Additionally, the ALJ found that Mr. Allen's symptoms would cause him to be off-task for approximately 3% of the total day and that Mr. Allen should avoid concentrated exposure to cold temperatures. The ALJ determined that the treating physician's opinion and Mr. Allen's testimony were not credible to the extent they were not supported by the medical evidence. R. at 66-67. The ALJ reviewed the opinion evidence of Dr. Geringer in light of Dr. Geringer's own treatment notes, the testimony of the ME, and the remaining medical evidence, and found that the evidence did not support Dr. Geringer's opinion. R. at 67. The ALJ reviewed Mr. Allen's testimony in light of the medical evidence in the record, and found that the evidence did not support Mr. Allen's testimony as to the severity of his symptoms. R. at 66-67. In these regards, the ALJ's evaluation, analysis and explanation of his conclusions are appropriate.

However, the ALJ's finding that Mr. Allen could perform a full range of work at all exertional levels is not supported by the evidence. The Social Security Regulations classify jobs based on the physical exertion requirements as either sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. 404.1567. The ALJ specifically noted that his finding did not mean that "the claimant is pain-free or does not have limitations in performing some tasks." R. at 67. The ALJ found that Mr. Allen's impairments could produce the alleged symptoms, but found that Mr. Allen's statements regarding his symptoms were not credible to the extent they were inconsistent with the objective medical evidence. The ALJ, however, failed to explain how Mr. Allen's acknowledged impairments allowed him to perform work at all exertional levels.

The Commissioner argues that, even if the ALJ's finding regarding exertional levels was wrong, substantial evidence nevertheless supported the ALJ's determination that Mr. Allen could perform the identified jobs. The ALJ found that there were significant numbers of jobs at the "light and unskilled level" that existed in the national economy that Mr. Allen could perform. R. at 68. The Court agrees that, if Mr. Allen were able to perform jobs at the light exertional level, then the jobs identified by the ALJ could be performed by a person with Mr. Allen's characteristics. However, the ALJ failed to make

specific findings as to how or whether Mr. Allen's credible limitations would allow him to perform work "at the light and unskilled level" as opposed to the sedentary level. R. at 68. Importantly, the ALJ identified no jobs in the national economy that a person with Mr. Allen's characteristics could perform if he were limited to jobs at the sedentary exertional level. On remand, the ALJ must make a specific finding regarding Mr. Allen's exertional level in light of Mr. Allen's credible limitations, as well as whether jobs exist in significant numbers for a person with Mr. Allen's characteristics, including his exertional level, could perform.

## CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's Motion for Summary Judgment, and GRANTS Plaintiff's Motion for Summary Judgment, in part, remanding the matter back to the Commissioner for further action consistent with this Opinion.

Dated: June 18, 2010        E N T E R:


ARLANDER KEYS
United States Magistrate Judge